## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:22-cr-254 (RC)** |
| **TYLER ETHRIDGE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Tyler Ethridge to 60 months of imprisonment, three years of supervised release, $2,000 in restitution, and the mandatory $270 special assessment. The government's recommended custodial sentence lies near the low end of the applicable Sentencing Guidelines range.

### I.     INTRODUCTION

Defendant Tyler Ethridge—a 35-year-old service crew member for a sewer collection company and a former minister—participated in the January 6, 2021 attack on the United States Capitol, a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

After a bench trial with stipulated facts, the Court found Ethridge guilty of two felonies and four misdemeanors. Specifically, the Court found that Ethridge violated 18 U.S.C. §§ 231(a)(3) (Civil Disorder); 1512(c)(2) (Obstruction of an Official Proceeding); 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); and 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds; and 40 U.S.C. §§ 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds); and 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).

As explained herein, a sentence of 60 months of incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory special assessment of $270 is appropriate for Ethridge because he (1) was at the forefront of the first group of rioters to breach the restricted area; (2) helped remove the bicycle rack barricades at the first breach point, which facilitated the mob's success in overwhelming the U.S. Capitol's perimeter defenses; (3) ignored police efforts to repel and disperse him and other rioters on the West Plaza, which included being struck by pepper spray and rubber bullets; (4) climbed scaffolding outside the Capitol building and exhorted other rioters to fight the police; (5) unlawfully entered the U.S. Capitol building through the Upper West Terrace Door; (6) exhibited clear knowledge that his conduct was illegal, such as when he urged another rioter to cover his face to conceal his identity and when he recorded himself justifying his conduct even though he knew it would likely get him fired from his job as a pastor and might lead to him being jailed; (7) penetrated to the Rotunda; (8) braced himself and physically

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

resisted police efforts to force him out of a hallway near the Rotunda; (9) spent a total of 30 minutes inside the building; (10) after January 6, posted multiple statements on social media exalting the riot and demonstrating his lack of remorse; and (11) was not completely truthful in his FBI interviews. The government's recommended sentence reflects the gravity of Ethridge's conduct while also acknowledging his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the "Joint Statement of Elements and Facts for Bench Trial with Stipulated Facts," ECF No. 26, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.9 million dollars.

### B.     Ethridge's Role in the January 6, 2021 Attack on the Capitol

In the fall of 2020, Ethridge's friend ("Person-1") offered Ethridge a paid-for, roundtrip plane ticket and Airbnb stay to attend former President Donald Trump's rally in Washington, D.C. on January 6, 2021. Ethridge accepted, and on January 4, 2021, Ethridge, Person-1, and Person-1's son ("Person-2") flew from Denver International Airport to Philadelphia International Airport. The three then rented a car and drove to Washington, D.C. to meet Person-3, who helped Person-1 organize the trip.

On January 6, 2021, Ethridge, Person-1, Person-2, and Person-3 took an Uber to the Washington Monument to attend the rally. During former President Trump's speech—and long *before* former President Trump urged his supporters to march on the Capitol—Ethridge, Person-

1, and Person-2 left the rally and walked with the angry crowd to the U.S. Capitol building along the Pennsylvania Avenue approach. Ethridge was at the forefront of the mob.

### Approach to the Capitol

At approximately 12:55 p.m., while on restricted Capitol grounds near the Peace Circle, Ethridge, along with the vanguard of the mob, was briefly stymied by mesh fencing and a set of bicycle rack barricades, which bore "Area Closed" signs. These bicycle rack barricades formed the outer edge of the perimeter defenses for the restricted Capitol grounds and were guarded by a small group of U.S. Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers. Together, the mesh fencing, bicycle rack barricades and small group of approximately four police officers briefly blocked the mob's path to the U.S. Capitol Building, as shown in Exhibit 1.



*Exhibit 1: mesh fencing and bicycle rack barricades, bearing "Area Closed" signs, blocking the path to the U.S. Capitol building for the first group of rioters.*

After a few minutes, the crowd—including Ethridge—surged forward, destroying the barricades, overwhelming the police officers, and knocking one of them—USCP Officer Caroline

4

Edwards—to the ground, injuring her and causing her to suffer a concussion and bruising. *See* Exhibits 2, 3.

 

*Exhibit 2: Officer Edwards' injured eye*    *Exhibit 3: Officer Edwards' bruised leg*

Although Ethridge did not personally strike Officer Edwards, he nevertheless contributed to her injuries. Ethridge participated in the mob's sudden surge, which overwhelmed the police, including Officer Edwards, and which was the first breach of the Capitol's perimeter fencing.

Ethridge did more than run and push forward past the police. He also helped remove the bicycle rack fencing erected on the northwest approach to the U.S. Capitol, which bore a large sign declaring "Area Closed." *See* Exhibit 3.



*Exhibit 3:  Screenshot of video of Ethridge (circled in yellow) helping to remove fencing along the northwest approach to the U.S. Capitol.*

Ethridge proceeded with the crowd past the barricades to the West Plaza outside of the U.S. Capitol building. There, while people in Ethridge's earshot chanted "Stop the steal! Stop the steal!", Ethridge was pepper-sprayed and shot with rubber bullets by police officers attempting to control and disperse the crowd. As Ethridge documented via a video he posted on social media, one of the rubber bullets struck Ethridge in the knee, causing him to yelp in pain, and the pepper spray caused him to cough. *See* Exhibit 4. None of this deterred Ethridge, however.



*Exhibit 4:  Screenshot of video Ethridge posted to Parler of Ethridge on the West Plaza holding up a rubber bullet round and exclaiming "I just got shot in the knee!" In the same video, Ethridge pans and shows pepper spray cannisters launched by law enforcement officers landing amongst the crowd.*

Instead of leaving the Capitol grounds, Ethridge climbed a media scaffolding and exhorted the crowd to continue fighting the police. *See* Exhibit 5.

7



*Exhibit 5: Photograph of Ethridge (circled in yellow) standing on the northwest media scaffolding.*

While on the media scaffolding, Ethridge received a text from Person-1 directing him to meet at the statute of Ulysses S. Grant outside of the Capitol. Ethridge climbed down the media scaffolding and waited at Grant's statue for approximately 10–15 minutes for Person-1 but Person-1 did not appear. While waiting for Person-1, Ethridge observed people going up the stairs and into the Capitol building. He joined that mob.

### *Entry into the Capitol Building*

At approximately 2:35 p.m., Ethridge entered the Capitol building via the Upper West Terrace Door, as captured on the Capitol's surveillance cameras. *See* Exhibit 6.



*Exhibit 6:  Photograph of Ethridge (circled in red) entering the U.S. Capitol building via the Upper West Terrace doors.*

From there, Ethridge proceeded to the Rotunda. As he walked to and then up the stairs leading to the Rotunda, Ethridge recorded video on his cell phone. In that video, loud alarms are blaring as Ethridge urges another protestor to "cover your face." *See* Exhibit 7.

Ethridge stayed in the Rotunda for approximately three minutes. While in the Rotunda, police officers attempting to control and disperse the crowd deployed more pepper spray, and again Ethridge suffered its effects. Rather than exit the Capitol, however, Ethridge remained and filmed several videos that he posted to social media glorifying, promoting, and justifying the riot. *See* Exhibits 9-10. For example, Ethridge said:

a.   "We stormed the Capitol. [. . .] This is amazing. I hope this doesn't get me thrown in jail. I'm officially a pastor. This is what pastors need to do. [...] Christians, we need to infiltrate every area of society like this. Every area of society like this. Peacefully. But if it takes a little bit of aggression to barge

9

through the walls that Satan separates us from the culture, it's time for the body of Christ to infiltrate the culture." Exhibit 9; and

b.  "I don't want to say what we're doing is right. But if the election is being stolen, what is it going to take? [. . .] I'm probably going to lose my job as a pastor after this [. . .] I think we're to a point where talk is cheap. If this makes me lose my, my reputation, I don't care." Exhibit 10.

### *Physically Resisting Police Efforts to Clear the Building*

Approximately five minutes after leaving the Rotunda, Ethridge joined a crowd of rioters in the hallway between the Rotunda and the Senate Chamber. Ethridge and the other rioters found themselves blocked by a line of MPD officers, who were protecting the Senate Chamber. The MPD officers repeatedly ordered Ethridge and the other rioters to turn around and disperse. Ethridge heard these commands, but he and the other rioters refused to leave. Eventually, the line of MPD officers forcibly pushed Ethridge and the other rioters out of the hallway. Ethridge, like others, braced his body and tried to physically resist the officers' efforts to move him out of the hallway, as shown in Exhibit 11.



*Exhibit 11: Ethridge in the hallway between the Rotunda and the Senate Chamber, attempting to passively physically resist officers' efforts to physically remove him from the area.*

After this physical conflict with law enforcement officers, Ethridge returned to the Rotunda, where he stayed for approximately 10 minutes. Ethridge then exited the Capitol building, having spent approximately 30 minutes inside the building.

### *Subsequent Statements*

In the aftermath of the riot on January 6, 2021, Ethridge was active on Facebook and Twitter, where he made statements consistent with his intent to obstruct Congress' official proceeding to certify the results of the 2020 presidential election and revealing his lack of remorse for his conduct on January 6. The following posts by Ethridge on his Facebook profile, tyler.ethridge.xxxx with Facebook ID xxxx2554, each dated January 7, 2021, are representative of Ethridge's conduct on social media in the aftermath of his invasion of the Capitol:

    a.   Ethridge posted: "We weren't inspired by anyone to do what we did. We've been awakened over the past four years to a communist insurgence," and "I was there.

Literally the tip of the spear. Yes, I encouraged us to press forward to the base of the Capitol. I don't regret that decision one bit." Exhibit 12.

b.  In response to comments on Ethridge's Facebook profile, Ethridge posted "It's hard for anyone who wasn't personally there to understand the moment. It truly felt like a peaceful revolution. I stand by my stance and believe we should have stormed the Capitol to peaceably protest. Read it how you want. No one was shooting at the police. Some threw water bottles at them after they shot us with rubber bullets, threw smoke grenades and pepper sprayed us." Exhibit 13.

c.  An individual asked, "How did you personally get into the Capitol?" Ethridge responded, "a door behind the inauguration stage was wide open. We walked right in."

d.  In response to another post, Ethridge commented, "I don't think they anticipated the storming of the Capitol. There was great push back when people tried getting to Nancy Pelosi's office, but lenience in other places in the Capitol. The greatest resistance was right at the base of where we hold the inauguration. I think inside the Capitol was fishy. Especially after seeing other footage. I didn't stay long in there. It felt iffy so I bailed shortly after entering."

On Twitter, Ethridge revealed his lack of remorse for having participated in breaching the Capitol and obstructing Congress on January 6, 2021. For example, on September 24, 2021, Ethridge tweeted:

a.  "They want the peaceful protestors of #January 6 to be afraid and ashamed of what we did that day. They want us to fear our sentencing for going into the Capitol.

They want us to feel like what we did that day made things worse and served no purpose."

b. "A spirit I thought was long gone. It has shown me that the fight for freedom and liberty is still afoot. So my message to all who were involved in that day is this: Don't be ashamed. Don't fear. We will be vindicated. The truth will come out."

c. "Don't be afraid of what they sentence you with. I'm not. I'm ready for whatever I'll be charged with. America is still primed and ready."

In the years since January 6, Ethridge has continued to make statements underscoring his lack of remorse and his belief that he is being unjustly prosecuted, and thus persecuted, for his political beliefs, not because of his unlawful conduct. For example, on July 20, 2022, Ethridge provided an interview to Brownwoodnews.com in which he stated

> I did what I did. I don't regret anything. People who weren't there don't understand the moment. They don't understand the anger and frustration of the people. People want me to apologize for my actions. I've never claimed to be perfect. The adrenaline of the moment was other worldly. It felt similar to those feelings I would get before a state football game. Only 10x more intense due to the nature of the moment. I was a part of history that day. Whatever happens to me because of it will all be worth it in the end because I stood against an illegitimate government. And I did so without harming anyone.[2]

Ethridge went on to say, "If I have to go to prison for protesting a corrupt government I'll gladly do so." *Id.*

These self-justifying and minimizing statements have continued even after Ethridge's conviction.  On November 22, 2023 (*i.e.* ten weeks after the Court found Ethridge guilty after a

---

[2] "Q&A: Tyler Ethridge Speaks On Role At Capitol on Jan. 6," *Brownwoodnews.com*, July 20, 2022, available at: https://www.brownwoodnews.com/2022/07/20/qa-tyler-ethridge-speaks-on-role-at-capitol-on-jan-6/ (last accessed Dec. 20, 2023).

bench trial in which Ethridge stipulated to the facts, *see* ECF No. 25-28), Ethridge posted on the social media site X (formerly Twitter) that "J6 was the best thing to happen to me. [. . .] What I don't regret is peacefully and patriotically protesting a corrupt presidential election.  Tweet by "Tyler Ethridge," @TEEthridge, on November 22, 2023, available at: https://twitter.com/TEEthridge (last accessed January 9, 2024).  Additionally, even after admitting to his own role in facilitating, promoting, and exacerbating the riot, and even after the Court convicted him on all counts as expected, Ethridge has made repeated posts on X (formerly Twitter) in which he has sought to blame others—specifically supposedly covert government agents—for inciting the violence that occurred on January 6. *See, e.g.*, Tweet by "Tyler Ethridge," @TEEthridge on Nov. 17, 2023, posting a picture Ethridge alleges he took on January 5, 2021, of a white bus that Ethridge claims carried men dressed in military uniforms, implying that the January 6 riot was a secret military operation; *see also* Tweet by "Tyler Ethridge," @TEEthridge on November 30, 2023, calling another user's video from the Capitol grounds on Jan. 6, 2021, "Prophetic" because a person in the video warned the mob that he believed there were government plants amongst the crowd trying to stir up violence, both available at: https://twitter.com/TEEthridge (last accessed January 9, 2024).

### Ethridge's FBI Interviews

On January 22, and February 1, 2021, Ethridge—with counsel present—participated in two voluntary, recorded interviews with FBI agents.  During these interviews, Ethridge shared a copy of his travel itinerary to and from Washington, D.C.; provided agents with a USB thumb drive containing all of the videos he recorded on January 6; gave the agents access to his financial services, e-mail, and social media accounts; and admitted most of the facts about his path to and

through the Capitol, though not the most incriminating ones. Ethridge claimed that he only *watched* others destroy the first, second, and third barricades along the Pennsylvania Avenue approach to the U.S. Capitol and did *not* participate in destroying any of those barricades. Ethridge also claimed that he did not interact with the police while inside the Capitol building, thus omitting the incident when officers physically forced him out of the Rotunda hallway, overcoming his resistance. Ethridge also dubiously asserted that the reason he urged people on social media to "bear arms" in connection with protesting the allegedly stolen election was that he wanted people to have guns to protect statues and buildings from destruction.

### III.    THE CHARGES AND TRIAL VERDICT

On, September 8, 2023, after a bench trial with stipulated facts, the Court convicted Ethridge on all six charges against him: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 1); Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count 2); Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 3); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 4); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 5); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 6). *See* ECF No. 25-28.

### IV.    STATUTORY PENALTIES

Ethridge now faces sentencing on each of the counts listed above. The maximum terms of incarceration for each count are detailed in the chart below.

| Count | Statute | Maximum Term of Imprisonment |
|-------|---------|------------------------------|
| 1 | 18 U.S.C. § 231(a)(3) | 5 years |
| 2 | 18 U.S.C. §§ 1512(c)(2) | 20 years |
| 3 | 18 U.S.C. § 1752(a)(1) | 1 year |
| 4 | 18 U.S.C. § 1752(a)(2) | 1 year |
| 5 | 40 U.S.C. § 5104(e)(2)(D) | 6 months |
| 6 | 40 U.S.C. § 5104(e)(2)(G) | 6 months |

For each of the felony counts, *i.e.*, Counts 1-2, the Court may also impose a term of supervised release of not more than three years and a fine of up to $250,000, and the Court must impose a mandatory special assessment of $100 per count.

As for the Class A misdemeanor counts, *i.e.*, Counts 3-4, Ethridge faces up to one year of imprisonment, a maximum of one year of supervised release, a fine of up to $100,000, and a mandatory special assessment of $25 per count. On the Class B misdemeanor counts, *i.e.*, Counts 5-6, Ethridge faces up to six months of imprisonment, a fine of up to $5,000, and a mandatory special assessment of $10.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Here, the government agrees with Probation in most respects, including its conclusion that Ethridge should not receive a 2-point reduction in his offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, *see* PSR ¶¶ 53, 73, even though Ethridge's bench trial based on stipulated facts was the functional equivalent of a guilty plea, *see* ECF No. 25-28.

Application Note 2 to U.S.S.G. § 3E1.1 says that a defendant may receive credit for acceptance of responsibility even if he goes to trial if the record reflects, for example, that he did so solely "to assert and preserve issues that do not relate to factual guilt." *Id.* This is what the record reflects here. *See* ECF No. 27. Nevertheless, Note 3 says that even the acceptance of responsibility that is normally inherent in a guilty plea "may be outweighed by conduct of the defendant that is inconsistent with [acceptance of responsibility]." Here, Ethridge's post-conviction conduct—in particular, his Twitter posts that continued to justify his conduct at the Capitol, even after his stipulations and conviction—support Probation and the government's conclusion that Ethridge is not due any credit from the Court for accepting responsibility. *See* PSR ¶¶ 53, 73.

The PSR does contain one error, however: Ethridge should not receive a 2-point reduction pursuant to U.S.S.G. § 4C1.1, which Probation granted. *See* PSR ¶ 74.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case because Ethridge personally engaged in violence or credible threats of violence against people or property, as assessed under a totality of the circumstances. As discussed above, while Ethridge did not personally strike USCP Officer Edwards, Ethridge participated in the surge that overwhelmed Officer Edwards and other officers at the first breach point, knocking her to the ground and causing her to suffer injuries and a concussion. *See* PSR ¶ 19. Additionally, Ethridge physically resisted officers' efforts to clear him from a hallway near the Rotunda. *See* PSR ¶ 31. As such, Ethridge should not receive the benefit

of a reduction under § 4C1.1. The government is aware of at least three cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); and *United States v. Dillard*, 23-cr-49 (JMC).

The Court should not apply § 4C1.1 here for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), *available at* https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants

who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

Removing the 2-point reduction under § 4C1.1 raises Ethridge's adjusted total offense level from 23 to 25. The Court should order Probation to amend the PSR accordingly. PSR ¶ 75.

Raising the total offense level to 25, *see supra*, results in an increase to the custodial Guideline range. Meanwhile, the U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 78. Accordingly, the Court should order Probation to amend the PSR to reflect a custody range of 57-71 months. *See* PSR ¶ 120.

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offenses

As shown in Section II(B) of this memorandum, Ethridge's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Ethridge's actions directly facilitated and exacerbated the riot. He eagerly stormed the restricted Capitol grounds at the forefront of the first group of rioters, long before former President Trump urged his supporters to do so. Ethridge then participated in the very first breach of the Capitol's defenses, surging with other members of the mob to overwhelm the police and break through the fencing. Ethridge then helped move one of the bike rack barricades out of the way. In doing so, Ethridge both helped remove one of the most obvious indications that the grounds were off-limits and widened the path for rioters to rush through. Ethridge thus helped turn a trickle of rioters the police might have been able to contain into a flood that they could not.

By setting the example, leading the way, and making it easier for the mob to follow him, Ethridge exacerbated the riot. He continued to do so while on the West front. He shrugged off pepper spray and rubber bullets. He livestreamed and promoted the riot on social media as it was happening. And he climbed the media scaffolding tower, exhorting others to fight the police.

Once inside the Capitol building, Ethridge continued broadcasting, justifying, and glorifying the riot, attempting to build support for it, even as he openly acknowledged that his actions were likely to get him fired from his job as a pastor and possibly jailed. In other words,

Ethridge knew his conduct was unlawful, but he did it anyway because he believed his cause justified it. Finally, Ethridge physically resisted officers' attempts to clear him from the Rotunda hallway, directly using his body and strength to oppose the police. The nature and circumstances of Ethridge's offenses were of the utmost seriousness, and they fully support the government's recommended sentence of 60 months of incarceration.

### B.   The History and Characteristics of the Defendant

Ethridge has maintained steady employment throughout his adult life and has had no previous contact with the criminal justice system. His home life appears to be stable. But Ethridge's employment history is more concerning than mitigating. At the time he participated in the January 6 riot at the U.S. Capitol, Ethridge was a pastor at Christ-Center Church of Tampa in Dover, Florida. Ethridge knew better. But instead of applying the values he professed to follow, Ethridge used his position of moral leadership as a platform to promote "aggression" and rejection of the law to "infiltrate every area of society like this," claiming that "this is what pastors need to do." In the guise of moral and religious authority, Ethridge promoted and facilitated anarchy.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Ethridge's criminal conduct on January 6 was the epitome of disrespect for the law. As Judge Berman Jackson stated at sentencing in *United States v. Cronin*, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." Tr. 06/09/23 at 20.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

While Ethridge adopted a posture of cooperating with law enforcement and essentially pleaded guilty to all of his charges, he has never expressed remorse, let alone acknowledged that his actions were both wrong and destructive to society and the values he espouses. In fact, Ethridge has repeatedly minimized his conduct on social media, claimed that he merely participated in a peaceful protest, and suggested that the government had wrongly persecuted him and other January 6 defendants for their political beliefs, not justifiably prosecuted them for their unlawful conduct. Ethridge does not appear to have learned the right lessons from his prosecution and conviction in this case. Instead, he continues to pour fuel on the same fires that ignited the riot on January 6. The Court cannot have any confidence that Ethridge would not engage in the exact same behavior in the future if he thought it was justified; if he thought—again—that it was a necessary and righteous response to what he perceived as injustice. With the 2024 presidential election approaching, a

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Ethridge in a manner sufficient to deter him specifically, and others generally, from going down that road again.

E.      **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide the most suitable comparisons to the relevant sentencing considerations in this case, in that they involve defendants who pushed past police, disregarded police orders while inside the Capitol building, and/or lied to the FBI in their interviews.

Like Ethridge, the defendant in *United States v. Daniel Scott*, 21-cr-292 (RCL), facilitated one of the first and most consequential breaches of police lines. Scott—a large man and a Proud

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Boy known by his nickname, "Milkshake"—bulldozed through and past a defensive police line on the West Plaza, causing the police line to collapse at that point. Scott's conduct gave rioters access to an exterior staircase that led to the Upper West Terrace and allowed rioters to outflank the police. From there, rioters reached the Senate Wing Doors, which they broke through, enabling rioters to enter the Capitol building itself. Also like Ethridge, Scott loudly encouraged his fellow rioters, urging his fellow Proud Boys to "take the fucking Capitol," and was not completely candid during his two FBI interviews. Scott pleaded guilty via plea agreement to violations of 18 U.S.C. §§ 1512(c)(2) and 111(a)(1) and was willing to testify against his fellow Proud Boys, for which the government gave him some credit even though the government has never called Scott as a witness. Judge Lamberth sentenced Scott to 60 months of incarceration. While Scott and Ethridge's actions were not identical, they were substantially similar, even though Scott pleaded guilty to a different crime than Ethridge. In fact, in some ways Ethridge's conduct was worse than Scott's, given that Ethridge spent 30 minutes inside the building and physically resisted officers' efforts to expel him, whereas Scott did not enter the Capitol. Ethridge thus deserves a similar sentence.

The case of *United States v. Rachel Powell*, 21-cr-179 (RCL), provides a useful comparator as well. Powell, like Ethridge, was one of the first rioters to break through the police line at the Peace Circle and enter the restricted Capitol grounds. Though Powell, in contrast to Ethridge, did not help remove any of the Peace Circle barricades herself, once on the West Plaza she pushed against barricades and encouraged other rioters to attack the police line. Eventually Powell entered the Capitol through a broken window. After spending a few minutes inside the building, Powell voluntarily exited and used an ice axe to try to break a different window nearby as a means to help

more rioters enter and take over the building. Like Ethridge, Powell expressed no remorse, gave interviews after the fact that minimized the riot and her own conduct, and maintained an active presence on social media, where she promoted the stolen election lie before the riot and continued to justify the unlawful actions of herself and others after it. Powell opted for a bench trial. Judge Lamberth convicted her of all nine charges, including 18 U.S.C. §§ 1512(c)(2) and 231(a)(3), and sentenced her to 57 months of incarceration. Ethridge and Powell's conduct on January 6 is more similar than not, and the main differences balance each other out. While Powell used an ice axe to try to break a Capitol window, she spent only a few minutes inside the building, whereas Ethridge spent 30 minutes inside and physically resisted police efforts to expel him. Similarly, both defendants acted to frustrate the investigations into them. Powell deleted the videos she recorded on January 6 from her iCloud and switched phones to prevent police from obtaining her device. While Ethridge took the opposite approach and provided his videos and account passwords to the FBI during two consensual interviews, Ethridge lied about his conduct during those same interviews, omitting his worst actions. Ultimately, Ethridge and Powell are similarly culpable and deserve similar sentences.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Mock was convicted of a violation of an offense under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take

account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Ethridge to pay $2,000 in restitution for his convictions on Counts 1-6. This amount fairly reflects Ethridge's role in the offenses and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 60 months of imprisonment, three years of supervised release, $2,000 in restitution, and the mandatory $270 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   */s/ Michael M. Gordon*
MICHAEL M. GORDON
Senior Trial Counsel, Capitol Siege Section
Assistant United States Attorney
Florida Bar. No. 1026025
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
michael.gordon3@usdoj.gov
(813) 274-6000

*/s/ Brendan Ballou*
BRENDAN BALLOU
Special Counsel, Detailee
D.C. Bar No. 241592
601 D St., NW

30

Washington, D.C. 20001
brendan.ballou-kelley@usdoj.gov
(202) 431-8493