# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 1-22-cr-254 (RC) |
| | : | |
| TYLER ETHRIDGE | : | |
| | : | |
| _____ | : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Tyler Ethridge, through undersigned counsel, submits this sentencing memorandum to aid the Court at sentencing. Following a stipulated bench trial, Mr Ethridge was found guilty of Civil Disorder in violation of 18 U.S.C. §231(a)(3); Obstruction of an Official Proceeding in violation of 18 U.S.C. §1512(c)(2); Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. §1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. §1752(a)(2); Disorderly Conduct in a Capitol Building or Grounds in violation of 40 U.S.C. §5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. §5104(e)(2)(G). Based on the facts and arguments below, Mr Ethridge requests the Court sentence him to a 12-months period of home detention followed by a period of supervision to include community service; supervision to convert to unsupervised upon completion of community service. We submit that this sentence would most accurately address the concerns of the sentencing statute, 18 U.S.C. §3553.

As is our practice, we are not going to belabor the Court with a recitation of the information contained in the Presentence Report. Rather we will contain our remarks to factors we feel pertinent and relevant to the Court's sentencing calculus outside of that document, focusing on Mr

Ethridge's actions and memories of the events of 6 January 2021, and perspective on his position three years later.

**Prologue to 6th January.**

Tyler Ethridge was a supporter of former President Trump. He'd believed in him back in 2016 and felt as the 2020 election loomed, while he had lost some of the enthusiasm of 2016, he still believed Trump had earned his vote again for another term in office. The events of the latter part of 2020 took on a very strange undertone though. In the period leading up to the election, perhaps reading the political tea-leaves, the former president claimed were he to lose this election, this could only happen if election fraud were to have taken place. This meme was bombarded across right-wing media.

A sad indictment of our times is media outlets have become increasingly polarized and seek not to *inform* their respective audiences, rather cater to the already-apparent biases of their target demographic. In response, it is natural for the audience, hearing what they want to hear, to become increasingly fervent having their particular suspicions and fears buttressed. No one likes to lose, and reassuring any crowd that *if we lose its because we were cheated* is an incredibly powerful narcotic, and this message struck a resonant chord with the Trump faithful. As the first Tuesday in November approached, the message of potential voter-fraud aimed at the devoted increased to frenetic levels: The scene was set for discord. Trump constantly stoked the fires claiming there was an organized effort from his adversaries to "steal" the election. This was nuclearized with the message that the conservative vote as a whole was being nullified. Again, the message resonated. In addition to the media, the circles and friends one encounters also has a strengthening factor to personal beliefs or fears. All this combined, and on the eve of the election the stage was set; the powder was primed.

PeterCooperLaw

3rd November arrived. The country watched with bated breath as America went to the polls. Tuesday evening turned into Wednesday; the nation perched on the edge of its seat as the election leaned towards Biden. The right-wing media went into overdrive. It didn't help that recount after recount left us 4 days without a decision, but by Saturday the result was called. The effect of this four-day delay only served to ramp-up the tensions and fears as the faithful watched what appeared to be Trump's prediction coming to pass. In the wake of the result, an explosion of frenzy followed with court cases, recounts, protests of cheating screamed from the rooftops. The new meme of "Stop the Steal" took to the airwaves. But as court case after court case collapsed, as recount after recount confirmed the returns, and as state after state refused to nullify their results, the options for the faithful dwindled. 6th January 2021 was the scheduled date for Congress to exercise its two-hundred-year-old constitutional duty in certifying the votes of the Electoral College, and this date quickly became the new focal point. Trump called for a huge rally for that day, and the MAGA hats responded.

**6th January, 2022**

As the day approached, Tyler Ethridge considered the situation. He had observed the last eight weeks frenzy and outrage from the outlets. He had discussed the events with close friends, relatives, and contemporaries. He had already attended the Million MAGA March in December, and was not particularly considering the J6 event. But, in the last few days counted down, Tyler was approached by a friend, Michael, with whom he attended the DC event in December and invited along to the rally. So, on the spur of the moment, he agreed to join, and Tyler, Michael, and Michael's son left Colorado. They believed this final Trump event would indeed be a once-in-a-lifetime experience. How right they were, but for *very* different reasons.

The party flew in to Philadelphia on the evening of the 5th. They rented a car and drove down to DC to an AirBnB they'd reserved. The next morning following breakfast and coffee

(Tyler's staple of an Iced Americano), they took an Uber downtown. As they approached the Ellipse area, they found the weight of the crowds meant the car couldn't get close. They disembarked the car and marched the remaining few blocks to the event. On arrival, the size of the crowd meant they could only see the rally from the area surrounding the Washington Monument. They could hear very little, and so, not being able to fully engage in this rally went searching for other events. As they strolled along the Mall they encountered other groups, some singing, some praying, some proselytizing to on all manner of political thoughts. One of Tyler's reasons for coming that day was to document the occasion, and this he did recording all these varied happenings, as he put it, "on our National Mall."

As they neared the Capitol grounds, Tyler remembers there were fewer people around, but noted an increased police presence. It wasn't long though before they became aware of the multitude of people who had been at the Stop-The-Steal rally, a mass of singing, chanting, flag-waving sea of red, white, and blue starting to descend. There was an overwhelming feeling of unity and patriotism that was hard not to be swept-up in. Tyler and his friends were not immune, and as crowd achieved critical mass, packed like sardines, pressure on the barricades became irresistible. The barriers gave way, the police fell back, and the mob surged up the hill. This was a crucial moment that would Tyler Ethridge's life changed forever.

Let us be clear at this point. Tyler fully accepts responsibility for his own actions and decisions. However, there is no question herd-mentality and grabbed the crowd and no one was making rational decisions. Many people involved that day have related similar feelings: that they succumbed to the insanity of the moment and acted in a manner they had not envisioned twenty minutes earlier. The manner in which they engaged, *willingly*, in such a horrifying occurence is incomprehensible. This is exactly where Tyler finds himself. To this day he still finds it difficult

PeterCooperLaw

to believe he was a part of this crowd. The blood was up and the adrenaline was flowing however, but his Rubicon moment was still to come.

He found himself on the west terrace in the area of the inauguration scaffolding. The atmosphere was reaching fever pitch. The crowd was at boiling point. And then, in an instant, the building itself was open. Tyler remembers thinking, "*am I a Trump supporter? Yes! Do I believe the election was stolen? Yes!!!* The MAGAs flowed in, and Tyler followed. He'd been seduced by the herd-mentality at the bottom of the hill, but it's here where the point of no return was. Here was the Rubicon. Here was the line in the sand. He remembers everything being a bit of a blur. One minute they were outside on the steps, the next he was inside[1].

Inside the building, strangely there seemed to be a lull in the crowd. There wasn't the pushing and shoving typical on the outside, but rather individuals wandering around, taking in the building itself. It was almost as if having gained access to the halls of power, the crowd, at least in the area Tyler was in, had somewhat ran out of steam. Tyler himself was filming the events and he remembers similarly to the crowd, starting to feel this drain of adrenaline. Upon encountering a band of police officers trying to clear the building, he understood it was to time to get out. And 30 minutes after entering on the west side, he found his way out through the ceremonial doors on to the East Plaza.

Once outside Tyler decided enough was enough. He'd been separated from Michael and his son, but as he found himself on the East Plaza, he stumbled upon the son. They had no idea where Michael was and due to the nature of the cell service being down, had no way means of contact. They decided to get out of the area and make their way back to the AirBnB, hoping they could reach Michael. Once away from the immediate Capitol area, cell service returned and they

PeterCooperLaw

---

[1] Mr Ethridge's entry point was a door opening in from the west terrace to a set of stairs leading up to the Rotunda. This entry point was not forced from the outside but opened from within by other rioters already in the building.

were able to reach Michael and settle on a plan for the AirBnB. At the house, they turned on the television and were stunned. They had not experienced the severe violence seen in some places in person, but now it was there for all the world to see. That night they stayed in their house. As they watched the reports coming in, they became aware of what had transpired at other locations in and around the building, and hearing reports of what had taken place, the gravity of what had transpired set in, and the feeling that things would never be the same again was inescapable.

**The Present Day.**

Tyler Ethridge looks back at the events of 6th January 2021 with regret. He feels regret from several angles. First, he expresses remorse for his actions that day. In going to the Capitol, he had no intent to engage in any of the behavior that rose to the level we all experienced. The environment he found himself in was animated and he found himself being swept along, both emotionally in the mentality of the mob and physically in the manner in which he found herself in the Capitol building itself. As we have mentioned, that is not to say that he was forced in against his will but rather the frenzy left little time for self-reflection: the self-reflection he now employs. He looks back now and understands the gravity of being inside the building; what it meant. It brings home that this went way beyond any initial intent. It is the trigger of why he realized he had to get out. He wishes he'd encountered that epiphany on the west terrace before things got out of hand. He knows that despite a lack of any underlying malevolence, or any thought to alter the election, or even to *fight like hell*, his actions crossed a line, and he accepts responsibility for this.

Secondly, he feels sadness at the manner that the day and its participants are now perceived. He came to DC with the honorable intent of displaying his support for the outgoing president and hearing him speak one last time. But the nature of the violence the nation witnessed has cast a pall over anyone who attended that day, and that is something he describes as "horrible," and a "nightmare." He has spent a lifetime developing his character as Tyler Ethridge, pastor and

PeterCooperLaw

teacher, husband and father. But now he is simply known as Tyler Ethridge, J6er. His reputation is destroyed. He feels he cannot go anywhere without the notoriety of involvement in that day following him. Being a man of faith, he is fully aware of the act of contrition being an indelible stop on the path to redemption. He realizes it is a sentencing he faces, but he also sees it as the first step on his path and while he views the hearing with trepidation, he also sees it as a cathartic moment in his journey forward and wishes to make plain to the Court that he knows he's here based on his own actions and takes responsibility.

**Sentencing Factors.**

18 U.S.C. §3553 provides:

**(a) Factors To Be Considered in Imposing a Sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed—
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> **(B)** to afford adequate deterrence to criminal conduct;
>> **(C)** to protect the public from further crimes of the defendant; and
>> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Addressing these factors individually we find the following. Nature and circumstances of the offense with respect to this offense is a highly combustible issue, and we will return to it later. On history and characteristics of the defendant there is not much debate. Tyler Ethridge has no criminal history; indeed this is his first encounter with the criminal justice system. His background displays an individual who has not only led a completely law-abiding existence prior to the events bringing him here, but one portraying a husband and father of two daughters who runs his own business. Subsection (2)(A) discusses seriousness of the offense, respect for the law, and just

punishment for the offense. We will return to this also when we discuss nature and circumstances of the offense. Subsection (B) contemplates adequate deterrence to criminal conduct. He has been emotionally shaken by these experiences with the justice system, and the insight he has acquired has left him with the strongest of convictions that this will be his last. Incarceration is not necessary to make that point. Subsection (C) considers a similar idea as that in (B), in protecting the community from further criminal contact. Here we point out Tyler Ethridge is *literally* as far from being a career offender as is possible and, again, given his experiences here, the public has nothing to fear from him in the future. As a final comment on Subsections (B) and (C), the events of, and leading up to, January 6 constitute Mr Ethridge's first and only foray into mass political events. He has been scarred by this and has vowed to stay as far away from such happenings as possible. With respect to his views on the ex-president, Mr Ethridge maintains that Mr Trump will now have to get by without Tyler's presence at any rally. Regarding Subsection (D), quite simply Mr Ethridge has no need of any of the services available to U.S. Probation. Which brings us back to sections (1) and (2)(A).

Returning to the nature and circumstances of the offense we find in these matters this is a not a simple issue to unpack. On the one hand, the specific conduct and decisions Tyler accepts responsibility for, in the universe of criminal conduct, are not the most violent and egregious considered by these courts. However, taken into context with the much larger events of 6 January, the nature and circumstances question become much less clear. There is no question the events of that day have left a deep scar on the national psyche. Seditionary behavior has in some cases been charged and convicted. But we ask the Court to take note that Mr Ethridge is one of a small group of people who despite having gone down the regrettable road of entering the Capitol realized it was not the place to linger and got out as quickly as possible. We ask the Court to recognize that even at what appeared to be the point of no return, this was a river he knew had to be crossed back.

PeterCooperLaw

We ask the Court to view his actions against the backdrop of those with more sinister intentions as proof of his original harmless purpose and sentence him accordingly.

Addressing (2)(A), we have already discussed Mr Ethridge's view of the events of that day being contrary to the best interests of the country, but he also views those acts as not being true to his core values of respect towards law and order. We highlight to the Court that he has never been associated with any organisation encouraging civil disobedience, advocated overthrow of the government, displaying extremist right-wing views, or has encouraged in any way violence of the nature apparent on 6th January. In terms of any sense of danger to the community, there is simply non: it does not exist. The Court should have no concerns as to his views on the respect for law either today or for the future.

The final issue §3553 to be discussed is the last part of (2)(A): just punishment for the offense. Obviously, this is the very central issue for this Memorandum as a whole. Mr Ethridge is a law-abiding citizen, who placed himself in the wrong place at the wrong time. He came to DC to attend a political rally, and quickly found himself in the middle of an escalating situation in which speech, free or not, was being dropped as a form of expression by a mob, spinning out of control, where rage was taking over. He has been shattered at the fallout from that day. His life will never be the same again. This, in and of itself, is more than adequate punishment. In no way, shape or form should the Court be under the impression that a departure sentence would be seen as getting away with anything. For the rest of his life Tyler will forever be associated with the events of that day, and he takes this to heart. Given all discussed above, including the fact of his decision to disengage when he did, we ask the Court to sentence in accordance with our proposal.

**Sentencing Enhancements**.

The government seeks an eight (8) level enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B), which calls for such where: "[T]he offense involved causing or threatening to cause

physical injury to a person or property damage, in order to obstruct the administration of justice…" However, Mr Ethridge is not alleged to have injured anyone or engaged in violence on January 6, 2021. Indeed, in the pre-sentence report, the writer indicates that "it is unclear if the defendant personally used violence…" *See Stinson v. United States*, 508 U.S. 36, 44-45 (1993) (Supreme Court holding that commentary should, "be treated as an agency's interpretation of its own legislative rule."). *See also id.* at 38 (Supreme Court holding that commentary which, "interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

A plain reading of the commentary reveals the inapplicability of this section to Mr Ethridge. Were the Court to adopt the government's interpretation, any defendant convicted of § 1512(c)(2) would automatically qualify for the eight (8) level enhancement and be subjected to an effective base offense level of twenty-two (22), with a minimum recommended imprisonment of 41-51 months. Again, this Court should not indulge the government's attempt to shoehorn these statutory offenses into Guidelines with significant enhancements the Sentencing Commission never contemplated applying to the events of January 6, 2021. Thus, the only conduct for which Mr Ethridge should be held responsible is the conduct for which the Court found him responsible and not for the thousands of rioters who convened on January 6, 2021.

With respect to Mr Ethridge's conduct, a plain reading of the Guideline confirms that its intent is not to apply to, "threatening to cause physical injury to [*any*] person." Rather, the Guideline is clearly intended to apply only to those persons who serve also as participants in the administration of justice, such as witnesses or judicial officers. As the commentary to § 2J1.2 makes clear, reference to "property damage" was added to subsection (b)(1)(B) to include cases where, for example, a witness's property is destroyed, or threatened to be destroyed, for the

purpose of intimidation. Consider, for example, the 1991 Amendment to the Guideline which, "clarifies the types of circumstances to which §§ 2J1.2(b)(1) and 2J1.2(c)(1) apply" and for which each of the amendments clearly apply to participants in the proceeding. The government has not and does not allege that Mr Ethridge had a plan to stop the certification of the electoral college, let alone threaten its participants.

Finally, even were the Court to conclude that the offenses for which Mr Ethridge was convicted, "involved . . . threatening to cause property damage . . . in order to obstruct the administration of justice," because the certification of the electoral college vote is not "the administration of justice," this enhancement may not be applied. The "administration of justice" is in fact a legal term of art, so much so that it is defined within Black's Law Dictionary: "The maintenance of right within a political community by means of the physical force of the state" and "the state's application of the sanction of force to the rule of right." A*dministration of Justice*, Black's Law Dictionary (11th ed. 2019), quoted in *United States v. Seefried*, 2022 U.S. Dist. LEXIS 196980, at *5 (D.D.C. Oct. 29, 2022). Similarly, "due administration of justice" is defined as "[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties." *Id.* Therefore, a plain reading of § 2J1.2(b)(1)(B) suggests that the enhancement applies only where the obstruction of a judicial or quasi-judicial tribunal has occurred.[2]

PeterCooperLaw

---

[2] The District of Columbia Court of Appeals has interpreted "due administration of justice" to primarily (if not exclusively) be used, "to describe the proper functioning and integrity of a court or hearing." *Wynn v. United States*, 48 A.3d 181, 191 (D.C. 2012).

As the Court is aware, this was the conclusion reached by Judge McFadden in this District when the issue was similarly presented at sentencing. *See Seefried*, 2022 U.S. Dist. LEXIS 196980, at *31-32

> "If the Sentencing Commission had foreseen the Capitol breach, it may well have included 'official proceeding' in the text of § 2J1.2. But the Commission did not. Given that the Court should interpret the Guidelines using traditional tools of statutory interpretation, this Court declines to rewrite § 2J1.2 to say what it does not. If the Commission wishes to expand the text of the Guideline to include official proceedings such as the electoral certification, 'it may seek to amend the language of the guidelines by submitting the change for congressional review.'" (quoting *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018).

In its memorandum, in addressing Judge McFadden's analysis, the government argues that merely because a definition does not include an event, does not mean it is excluded. However, concerning the definitions within the commentary of § 2J1.2 relating to "administration of justice," as the government points out, we encounter "investigations, verdicts, and judicial determinations." The government goes on to discuss interfering with a felony investigation and cites this as not being enumerated. But, if we look to the stark meaning of obstruction of justice, or perverting the administration of justice by another name, Black's Law Dictionary defines it as, "The skewing of legal proceedings, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge." Black's Law Dictionary (11th ed. 2019). Despite not being listed, interference with a felony investigation clearly points towards skewing of *legal proceedings*, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge, whilst the application requested by the government plainly does not. (emphasis added). To drive home the point, the Background to § 2J1.2 provides:

> This section addresses offenses involving the obstruction of justice generally prosecuted under the above-referenced statutory provisions. Numerous offenses of varying seriousness may constitute obstruction of justice: using threats or force to intimidate or influence a

juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations; obstructing a criminal investigation; obstructing a state or local investigation of illegal gambling; using intimidation or force to influence testimony, alter evidence, evade legal process, or obstruct the communication of a judge or law enforcement officer; or causing a witness bodily injury or property damage in retaliation for providing testimony, information or evidence in a federal proceeding. The conduct that gives rise to the violation may, therefore, range from a mere threat to an act of extreme violence.

In sum, Congress went to great lengths to include what it believed to be pertinent. The government's interpretation is not included, and we ask the Court to view this as Judge McFadden has and take the position that it would be improper to add language to a statute that Congress did not.

Regarding the three (3) level enhancement pursuant to § 2J1.2(b)(2) this does not apply insofar as the certification of the electoral college is not a proceeding the interference of which constitutes the interference with the administration of justice.

**Need to avoid sentencing disparities.**

A word on sentencing disparities and the need to avoid. The essential problem here is the spectrum to which these defendant's belong is vast and by nature, disparate. In these cases it is entirely appropriate to sentence one participant to incarceration while effectively placing another on probation, and while those two sentences would appear to be disparate based on the charges, they may not when viewed in terms of the individuals involved. The trick then is to tailor a sentence to the subject before the Court. We ask the Court not to sentence Mr Ethridge based on the circumstances of others, but to focus on him and his participation here and sentence accordingly.

**Conclusion**

Taking all the above into account. We ask the Court to provide the following sentence. We submit the community would not be benefitted by any period of incarceration, but would be by a period of home-detention followed by supervision to include community service; supervision to convert to unsupervised upon completion of community service. We believe the community would benefit far more from this service than any incarceration. We believe this sentence to best satisfy the above concerns of 18 U.S.C. §3553.

/s/ *Peter A. Cooper*
———————————————
Peter Cooper; 478-082
Counsel for Tyler Ethridge
400 5th Street NW.
Washington DC 20001