**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-cr-00254-RC** |
| | ) | |
| **TYLER EARL ETHRIDGE.,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**DEFENDANT TYLER ETHRIDGE'S SUPPLEMENTAL SENTENCING STATEMENT**

William L. Shipley, Jr., Esq.
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*

1. Offense Level Calculations Post-*Brock*

    a.  Guideline Calculation for Count Two:

The Guideline calculation in the Presentence Report uses Mr. Ethridge's conviction on Count Two, a violation Sec. 1512(c)(2), as the offense of conviction with the highest Adjusted Offense Level.  As part of that calculation, the original Presentence Report added a combined 11 levels of enhancements under Sec. 2J1.2(b)(1)(B)  -- +8 levels -- and Sec. 2J1.3(b)(3) -- +3 levels.

In *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024) the Circuit Court of Appeals for the District of Columbia held that Sec. 2J1.2(b)(3) did not apply to cases involving the events of January 6 given that the language of the enhancement limits its application to offenses that obstruct or interfere with the "administration of justice."  The Court held that the congressional proceedings taking place on that day did not involve the "administration of justice."

The +8 level enhancement under Sec. 2J1.2(b)(1)(B), although not at issue in *Brock*, is now inapplicable for the same reason – it too turns on whether or not the offense  interfered with the "administration of justice."

Consistent with *Brock*, the removal of the two enhancements from the calculation with respect to Count 2, the Base Offense Level is 14.

| | |
|---|---|
| Base Offense Level | 14 |
| Specific Offense Characteristics | N/A |
| Adjusted Offense Level | 14 |

b.      Guideline Calculation for Count One:

The Presentence Report does not include a separate Guideline calculation for Count One, the violation of Sec. 231(a)(3) – "Civil Disorder."  The Presentence Report does state that Sec. 2A2.4 is the applicable Guideline that would apply to Count One.

| | |
|---|---|
| Base Offense Level | 10 |
| Specific Offense Characteristics | N/A |
| Adjusted Offense Level | 10 |

The Government's calculation as to Count One seems to have applied the +3 level enhancement for "physical contact."  If the Government is referring to contact that is alleged to have taken place inside the Capitol, that claim is undermined by the Government's representation in the caption to Exhibit 11 in the submission made with respect to the Stipulated Bench Trial, i.e., that Mr. Ethridge was "passively" resisting officers' efforts to move him and other protesters out of the Capitol.  If Mr. Ethridge's passive resistance resulted in law enforcement officers making contact with Mr. Ethridge – rather than the other way around – the +3 level enhancement should not apply.

2.      Zero Point Offender Reduction

The PSR recommends the 2-level reduction under Sec. 4C1.1 because Mr. Ethridge is a "Zero Point Offender" who qualifies under the conditions set forth in that section.  The Government objects on the basis that the offense conduct involved the "use of violence or credible threats of violence."  Both other than make reference to this language, the Government does not point to any specific episode of violent activity personally engaged in by Mr. Ethridge, nor any credible threats of violence made by Mr. Ethridge.

3.    <u>Acceptance of Responsibility</u>.

Mr. Ethridge stipulated to facts that satisfied each element of the offenses with which he was charged.  As noted in the PSR, Mr. Ethridge cooperated with the FBI and DOJ starting with the first time he was contacted.  He produced evidentiary items such as all the videos taken by him when requested that he do so.

Nevertheless, the PSR does not provide for a 2-level reduction based on "acceptance of responsibility."

The Government and Probation fail to distinguish the difference between acceptance of responsibility for his criminal conduct – which Mr. Ethridge acknowledges -- and a concession by Mr. Ethridge that his beliefs regarding the outcome of the 2020 election were incorrect.

The latter is not necessary for Mr. Ethridge to receive the benefit from his acknowledgement of his guilt for his conduct.   He can admit the wrongfulness of the actions by himself and others while at the same time maintaining his subjective belief in the reasons that caused him to attend the "Stop the Steal" rally and later go to the Capitol with the crowd.

Application Note 1(A) to Section 3E1.1 requires that a defendant truthfully admit "conduct comprising the offense(s) of conviction, and truthfully admit[] or not falsely deny[] any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct)."

The Government prepared the Statement of Facts in the materials submitted to this Court as part of the "Stipulated Bench Trial" process.  Mr. Ethridge admitted every fact requested by the Government.

Note 1(A) to Sec. 3E1.1 allows for the denial of acceptance if a defendant falsely denies or frivolously contests relevant conduct that the court determines to be true, but the fact that a

defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous.

None of the other subparagraphs under Note 1 are a basis to deny Mr. Ethridge the benefit of acceptance of responsibility – several support application of the -2 level reduction for acceptance.

The Government's problem is it simply does not like Mr. Ethridge's post-January 6 commentary.  Beginning at page 11 of the Government's Sentencing Statement it chronicles various public comments by Mr. Ethridge in the immediate aftermath of the riot, as well as in the weeks and months that followed.  At page 12 the Government specifically references what it views as a "lack of remorse" in comments made by him on social media.

 It is not Mr. Ethridge's obligation to supplicate himself to the wishes of the prosecutor in order for him to be entitled to receive the 2-level reduction from the Court.  "Remorse" isn't referenced in the text of Sec. 3E1.1 or the Application Notes as a requirement for the benefit of "acceptance of responsibility" to be applied.

Mr. Ethridge's post-January 6 commentary reflects an acknowledgment of the criminality of his actions, and an acceptance of the possibility that he may face jail time as a result. He never claims he didn't act in a manner consistent with the crimes with which he was charged.  He represented that he personally acted peacefully – and he was not charged with any crime of violence.  He has never denied his conduct.  He has never denied that parts of his conduct were illegal.  He signed the statement of facts drafted by the Government and acknowledged its accuracy in this Court.

The only point of contention that he has consistently maintained is that he felt HIS actions were justified by events and his political beliefs.  But this is true of all episodes of "civil

disobedience" – a willingness to break the law and suffer punishment in service of ideals and political beliefs.  Mr. Ethridge is entitled to stand by his subjective political beliefs that protest was necessary in connection with the intended congressional certification of the electoral votes on January 6, 2020.  He went to locations he was not authorized to go to, and refused to leave when given a lawful order by the police to do so.  The right to engage in such protest activity – and to maintain a belief in the justness of that cause that motivated that activity – is the very foundation of political free speech.  That right does not extend to illegal conduct, and that is why Mr. Ethridge accepted his fate via the stipulated bench trial process.

His refusal to renounce his heartfelt political beliefs is not a basis to punish him more severely based on the prosecution's dissatisfaction with his level of contrition.

        3.      <u>Revised Guideline Calculations</u>:

Count Two continues to provide the highest Adjusted Offense Level  --  14.

After a 2-level reduction as a "Zero Point Offender" and another 2-level reduction for acceptance of responsibility, the ***Total Offense Level is 10***.

With a criminal history score of 0, placing him in Criminal History Category I, the recommended guideline range for Mr. Ethridge is 6-12 months and falls within Zone B of the Sentencing Table.

        4.      This Court Should Continue The Sentencing Hearing Until After the Supreme Court Issues Its' Decision in <u>*Fishcer v. United States*</u>.

As the Supreme Court has made clear, the first obligation of a sentencing court is to get the guideline calculation correct. *United States v. Gall*, 552 U.S. 38, 49 (2007).

While the guideline calculation based on Count Two is correct as of the date of this filing, that calculation could become incorrect if the Supreme Court decides the pending *Fischer* case in

favor of the defendant.  Such an outcome would require reversal of Mr. Ethridge's conviction under Sec. 1512(c)(2) and dismissal of that count.

Any sentence imposed based on a guideline calculation under Sec. 2J1.2 as recommended by the PSR would be error necessitating resentencing.  The Guideline calculation for Count One would be a Base Offense Level of 10, and a Total Offense Level of 6.  The recommended guideline range would be 0-6 months.

Because the outcome of the *Fischer* case could result in a significant change in the guideline calculation, Mr. Ethridge suggests it might be prudent to delay sentencing until July when the outcome of *Fischer* will be known.

5.  <u>Comparable Cases To Avoid Unwarranted Sentencing Disparities</u>.

Prior counsel opted to not provide this Court with comparable cases for the purposes of helping to avoid an unwarranted sentencing disparity in this case.  But a handful of representative sentencings by this Court justify the sentencing recommendation made by Mr. Ethridge after *Brock*.

a.  *United States v. Gordon*, 22-cr-00343-RC -- 18 U.S.C. Sec. 231(a)(3)

<u>6 months in custody; 24 months of supervised release</u>

Gordon traveled Washington to attend the "Stop the Steal" rally, and after the rally he walked with the crowd to the Capitol.   Just after 4:00 pm Gordon was yelling at the officers protecting the North entrance and repeatedly threw several heavy objects at the door.  Officers inside opened the door at times and sprayed a chemical agent at the crowd outside the door. When Gordon began kicking and striking the door, he was then sprayed in the face by the officers.  Gordon then left the area.

     b.     *United States v. John Andries*, 21-cr-0093-RC, <u>18 U.S.C. Sec. 1512(c)(2)</u>

          <u>12 months and 1 day in custody;  36 months of supervised release</u>

Andries traveled from Maryland on the morning of Jan 6 to attend the Stop the Steal rally.  After moving to the Capitol he was one of the first to enter the building through a broken window at 2:15 pm.  He moved through the building and was at the House Chamber door when another protestor was shot and killed.  Andries then left the building but remained outside in the crowd for at least two more hours.  He was in the crowd when it began to push back against police efforts to clear the Upper Terrace at 4:25pm.  Officers forcefully dragged Andries away.

     c.     *United States v. Williams*, 22-cr-00265-RC: 18 U.S.C. §§ 1752 and 641

          <u>6 months in custody; 12 months of supervised release</u>

Williams traveled from Colorado on January 5 to attend the "Stop the Steal" rally and then go to the Capitol.  He was with a group of five people who breached the police line at the scaffolding next to the Capitol building.  Williams was among the first to enter the Capitol at the Senate Wing Door around 2:14 pm – those doors were first breached at 2:13.  He then took a US Capitol Police Officer's equipment bag, traveled through several parts of the building, and left at 2:49 pm.  During his time in the building he was involved in the group of protestors who were pushing against efforts by officers to move the crowd out of the Crypt.

The Government chose to charge Williams with only misdemeanor offenses but his actual conduct is worse than Mr. Ethridge's conduct.

     d.     *United States v. Mullins*, 21-cr-0035-RC: <u>18 U.S.C. § 111(a)(1)</u>

          <u>30 months in custody, 36 months supervised release</u>.

Mullins attended the "Stop the Steal" rally and then proceeded to the Capitol building along with the gathered crowd.  From 2:07 to 2:28 Mullins was involved with the crowd pushing

the police barricade back.  Later in the afternoon Mullins was involved in some of the worst violence at the mouth of the Lower Terrace tunnel.  At 4:27 p.m., while several protesters and officers were engaged in a physical battle at the front of the tunnel, Officer A.W. fell to the ground on his back.  After laying there for approximately 30 seconds, Mullins grabbed one of Officer A.W.'s legs and along with another protester drug him down the stairs and into the crowd where he was assaulted by others.  Officer A.W. suffered physical injuries from the assault by Mullins and others.

The *Mullins* case is included because his conduct was so much more egregious than anything done by Mr. Ethridge.  The Government engages in "guilty by association" with regard to Mr. Ethridge by insinuating involvement on his part in conduct by others that resulted in the injuries suffered by Officer Edwards when she was knocked over by the bike rack barrier shoved into her during the first breach of a police barrier at 12:51.  But the video clearly shows Mr. Ethridge played no role in that other than being in mere physical proximity to the event.  Mr. Ethridge's only participation in the removal of barriers involved the plastic snow fencing that was to the left side of the walkway, allowing the crowd to move forward without the fencing being a barrier.  Mr. Ethridge had no involvement with the individuals who picked up the bike rack barriers and drove them into the line of Officers blocking their path, including Officer Edwards who was injured as a result.

Compared to the Mullins' sentence of 30 months for the actually assaulting and injuring Officer A.W., a custodial sentence that puts Mr. Ethridge in a BOP facility is not warranted by his offense conduct.

The Government cites two cases it claims are similar to Mr. Ethridge, and requests a comparable sentence.

*United States v. Scott,* 21-cr-292 (RCL):  Dan "Milkshake" Scott, a Proud Boy rioter from Florida traveled to D.C. as part of a group of hundreds of members of the Proud Boys who came to attend the "Stop the Steal" rally and protest at the Capitol.  Along with other Proud Boys from Florida, Scott wore various items of "tactical gear."  He remained with a group of more than a dozen Proud Boys for approximately an hour at the very front of the crowd near the stairs on the Northwest Corner of the Lower Plaza. At this location the police were attempting to maintain a bike rack barrier to keep the growing crowd away from the building.  A small number of  U.S. Capitol Police Officers – dressed in "soft" non-riot uniforms -- were maintaining their positions behind bike rack barriers blocking the entrance at the bottom of the stairwell that led up to the Upper Terrace and various access points to get inside the Capitol.  Defendant Scott, a very large man, suddenly and without warning physically assaulted two Officers blocking the path in front of the stairwell.  He knocked both to the ground with an "NFL worthy" tackle.  Hundreds of people in the crowd behind Scott immediately began to ascend the stairwell.  Within the next several minutes the same individuals pushed through all the remaining police barriers in their way and were the first to reach the Capitol building where they broke through the Senate Wing Doors at 2:13 pm and entered the building.

Scott did not go up the stairs – rather he stayed at the bottom level and was the subject of much cheering and adulation by other Proud Boys who witnessed what he did, celebrating with them the fact that the police line had been broken and the crowd was able to get to the Capitol after an hour of being stymied on the West Front.

Contrary to the Government's claim, there is no "similarity" at all between Mr. Ethridge's conduct at the Peace Circle at 12:51, and what Scott did in personally assaulting two officers and

creating the breach in one of the last remaining barriers keeping the crowd away from the Capitol.

Nor are the facts in the case of *United States v. Powell*, 21-cr-179 (RCL) remotely similar to Mr. Ethridge.  Powell was convicted after a bench trial on all nine charges against her, including violations of Sec. 1512(c)(2) and a felony Sec. 1361 count for breaking out a window with an ice ax she carried onto Capitol grounds.  She maintained her factual innocence at all times; she possessed a dangerous weapon; she engaged in violence in the form of property destruction; and she encouraged the crowd to attack the police at the very time physical confrontations between the police and rioters were happening.

In making the comparison to Powell, the Government makes a noteworthy contradiction of its own claim that Mr. Ethridge "physically resisted" police efforts to remove him from the Capitol.  Sentencing Statement, p. 27.

At p. 11, the caption under a still image marked as Exhibit 11, reads:

*Exhibit 11: Ethridge in the hallway between the Rotunda and the Senate Chamber, attempting to **passively** physically resist officers' efforts to physically remove him from the area.*

This is the best characterization, from the Government's perspective, it can muster in an effort to equate Mr. Ethridge's actions with patently more violent offenders -- a defendant who "bulldozed" two Capitol Police Officers in a brutal physical assault and then celebrated it, and a second defendant who employed a dangerous instrument to destroy a window while encouraging others to commit acts of violence against the police who went to trial and maintained her innocence all the way until sentencing.

<u>Recommended Sentence Post-*Brock*</u>

With the updated sentencing calculation pursuant to *Brock*, and for now assuming the continued vitality of Sec. 1512(c)(2) with respect to Mr. Ethridge's actions on January 6, 2021, the recommended Guideline Range is 6-12 months.

This Range is in Zone "B" of the Sentencing Table, and as such Mr. Ethridge is eligible for a sentence of probation subject to the provisions set forth in Sections 5B1.1(a)(2) and 5C1.1(c)(3) of the Sentencing Guidelines.

Those subsections provide that the minimum term of imprisonment set forth in the Guideline Range – in this case 6 months --  may be served by a term probation where a condition of that probation includes intermittent confinement, community confinement or home detention in place of imprisonment for the minimum term.

On that basis, Mr. Ethridge submits that 30 months of probation, with a condition that six months be served on home detention, is the appropriate sentence to be imposed here.


Dated: May 9, 2024               Respectfully submitted,



_____
William L. Shipley, Jr., Esq.
PO BOX 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com